**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNYSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No. 4:18-CR-00313 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES E. HOCKER | : | FILED ELECTRONICALLY |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    Introduction

The Defendant, James E. Hocker, has entered a plea of guilty to a One Count Information which charges the Defendant with Securities Fraud in violation of Title 18 U.S.C. §1348.  The Defendant entered his plea on October 11, 2018 pursuant to a Plea Agreement whereby the Government would recommend a three (3)-level reduction for acceptance of responsibility, if warranted. The Defendant further agreed that one million four hundred ninety-five thousand, seven hundred eighty-two dollars and sixty-two cents ($1,495,782.62) is the amount of loss resulting from his actions and furthered agreed to make full restitution in accordance to a schedule to be determined by this Court. Additionally, the Defendant waved his appellate rights.

In the instant case, the Defendant submits there are numerous mitigating factors which would justify a sentence significantly below the Advisory Guideline

1

Range as permitted by 18 U.S.C. §3553(a).  The corresponding Advisory

Sentencing Guideline score pursuant to the Plea Agreement is 32 with a criminal

history category V which is a range of 188 – 235 months.

The Defendant has been, for all practical purposes, a life long alcoholic and

for at least ten (10) years was severely addicted to cocaine. The Defendant also

suffers from psychiatric and physical issues that will be further discussed herein.

Further, the Defendant's prior record overstates the seriousness of his convictions

in that they are all related to his alcohol and/or cocaine addiction. There is no

evidence in his prior record that the Defendant ever engaged in any crimes of

violence including robbery, burglary, assault, etc. All the crimes, including the

present, along with those set forth in his prior record history are the direct product

of his long-term addiction to alcohol and cocaine. As will be discussed further

herein the Defendant has taken significant post-offense behavioral steps to deal

with his severe addictions and mental health issues.


## II.    <u>Relevant Mitigating Factors</u>

As the Court is aware, Section 18 U.S.C. §3553(a) allows, and in fact directs

the Court to impose a sentence which is "sufficient, but not greater than necessary,

to comply with the purpose as set forth in Paragraph 2."  §3553(a)(2) states that the

purposes are:

(a) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(b) to afford adequate deterrents to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

In fashioning a sentence to reflect the purposes for a specific sentence, 3553(a) directs the Court to consider factors including but not limited to:

(a) the nature and circumstances of the offense and the history and characteristics of the defendant;

(b) the kind of sentences available; and

(c) the need to provide restitution to any victims of the offense.

A series of other statutes provide further direction to Sentencing Courts. For example, under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the §3553 factors, the Judge is required to **"recognize the imprisonment is not an appropriate means of promoting correction and rehabilitation."** Also, under 18 U.S.C. §3661, **"no limitation shall be placed on the information concerning the background, character and conduct of (the defendant) which a Court of the United States may receive and consider for purpose of imposing an appropriate sentence."** (Emphasis added).

As this Honorable Court is aware, in every case a sentencing court must now consider all of §3553(a) factors, not just the Guidelines – in determining a sentence that is sufficient but **not greater than necessary** to meet the goals of sentencing. Imposed sentences that are less than Guideline calculated sentences as a result of a Court's consideration §3553(a) factors are termed "*downward variances*" as opposed to the **pre-Booker** restrictively prescribed "downward departure options" provided for in the Guidelines.  See also, **United States vs. Tomko**, 562 F.3d 558, 563 (footnote 3[1]) (3d Cir. 2009).

III.   <u>**The following factors, individually or cumulatively, compel a downward variance from the Advisory Sentencing Guideline range:**</u>

1.     **The Defendant's background** – James is forty-nine (49) years of age. His background is both insightful and tragically sad. James was born in Wurzburg, Bavaria Germany to Herald and Dessie Hocker. James' father was in the Army and was stationed in Germany at the time of his birth. His father was a veteran of the Korean War and also served two (2) thirteen (13) – month tours of duty in Vietnam. He was heavily decorated for his valor and service. Unfortunately, his father was a lifelong addict who drank every day and physically abused his wife, James, and his two siblings. There is no question in discussing his

---

[1] **Tomko** is an extremely important case since it began in the Western District of Pennsylvania and resulted in the **en banc** Court affirming a home detention sentence imposed by the District Court upon the defendant's conviction for income tax evasion.  **Tomko** has been cited numerous times by numerous Courts in the Western District of Pennsylvania and beyond.

father's behavior, that the father not only suffered from alcoholism, but also Post-Traumatic Stress Disorder (PTSD). This Court is well aware of the fact that in the 1960's and 1970's, that diagnosis was not even recognized let alone accepted the way it is today by behavioral specialists. As a result, James was exposed to regular physical beatings at the hands of his father and also witnessed the same being inflected upon his mother and siblings. James also reports that between the ages of four (4) and six (6), he was sexually abused. When counsel asked James to describe his father's drinking habit he stated, "Anywhere from a fifth to a half a case of beer every two (2) to three (3) days." In effect, his father was a functional alcoholic while in the Army and when he left the Army. That type of behavior by members of the armed forces would not be tolerated today, but in the 1950's and 1960's, heavy drinking, particularly after combat tours, was accepted. Especially by Veterans who sacrificed their lives day-in and day-out for their country. There is no question that this type of abusive childhood was one of the causative factors in James developing Depression, insecurities, loneliness, and Obsessive-Compulsive Disorders. By the time James reached eighteen (18), he had spent his entire life in a house filled with alcoholism, physical abuse, insecurities, and nothing remotely close to a positive environment.

James never attended college, however he attempted to join the Navy in August of 1988. He was discharged in September of 1988 for having a "Severe

5

Adjustment Reaction". After that, James had a series of minimal jobs, but was for the most part employed throughout the late 1980's and 1990's. In November of 1993, James married Angela Castelli. They were divorced in February of 2001. Two children were born of this union. Jesse J. Hocker, his son, is twenty-five (25) years of age and has honorably served in the United States Marines and has received an honorable discharge. During his service, he served a tour in Afghanistan in a high conflict area and also served tours throughout the Middle East during his time in service. He is presently employed as a civilian military contractor having served in Afghanistan with the maintenance and direction of drone devices for surveillance and precision bombing. He presently resides with his wife in Hawaii. As James has told counsel, "Jesse is the shining star in my life." Jesse's courage and commitment to country is one of the proudest moments in James' life. It is also a reflection upon James that he provided encouragement and financial support to his son and also his other children. Unfortunately, the other child born to his union with Angela Castelli, Nicole Hocker, twenty-four (24), is unemployed and lives in Lemont, Pennsylvania. She has a long history of intravenous heroin use and exposure to her natural mother's open sexual behavior with her paramour prior to the divorce in February 2001 and after. She has been "in and out of group homes between the ages of twelve (12) through seventeen (17)."

In June of 2004, James married Elaine Hornyak. They were divorced in June 2015 and had no children however, James helped raised her son and adopted him at age ten (10). His name is Harry Hocker. He lives in Clearwater, Florida. James also has another child, Zane Hocker who is seventeen (17), born to a relationship with Laura Allen. James had sole custody of Zane beginning at age one (1) and continued until January 2018 when Zane went to live with his mother in Lewistown, Pennsylvania.

James obtained his Pennsylvania insurance sales license in 1989. From October 2001 through October 2007, James was employed as an insurance agent by an insurance agency in Milroy, Pennsylvania. He left that agency and started his own agency in Bellefonte, Pennsylvania selling insurance products and annuities under James E. Hocker and Associates. James was an independent insurance agent, licensed by the Pennsylvania Insurance Department. However, he did not hold any license relating to the securities industry. In 2009, James morphed from being a daily alcoholic into developing a severe addiction to cocaine. At that point in time, he needed anywhere from five hundred ($500) to one thousand ($1,000) dollars a day to purchase cocaine. That amount increased as his intake increased. As a result, he devised the scheme that brings him before this Court, namely selling false securities to at least forty-two (42) different individuals, causing great monetary loss and hardship to each of them.

Prior to 2007, as reflected in the Presentence Investigation Report (PSR) at the section entitled "Mental and Emotional Health" paragraph 54-62 pages 17-18, James began his deep downward slide into mental illness which was only fueled by his severe cocaine addiction. In 2004, he was diagnosed as having an Obsessive-Compulsive Disorder (OCD) by the Universal Community Behavioral Health in Huntington, Pennsylvania. He also suffered from recurring thoughts of suicide fueled by his Depression, consistent with his long-term alcoholism, abuse as a child, and marital problems. Further, in April 2010, James was involuntarily committed pursuant to a 302 Petition after threatening to jump off a bridge to get the attention of his wife. That 302 Involuntary Petition was filed by the police officers who came to the scene. He also has been diagnosed as a sex addict and consistent with his OCD a hoarder. In 2010, James was diagnosed as suffering with Major Depression, Recurrent-Obsessive Compulsive Disorder, Checking and Organizing Type; Alcohol Dependence; and Family-related stressors.

Since May of 2018, he has been involved in bi-weekly counseling at Universal Community Behavioral Health in Huntingdon. He not only regularly attends and participates in N.A. and A.A. meetings but actively organizes them and sponsors others.

In reviewing James' mental health history in conjunction with his drug abuse/substance addiction and marital disfunction, there is no question that he

suffers from significant mental and emotional illness compounded by severe cocaine addiction which was the driving force that caused him to devise his scheme to produce the money that would allow him to purchase the drugs. As James stated to the probation officer, he had a "five hundred ($500) to one thousand ($1,000) dollars a day habit using a lot of eight balls". *See* PSR section Substance Abuse, paragraph 63, page 18-19.

All of the above related factors produced what James described to counsel as, "the perfect storm". Unfortunately, James did not have insight into the extent of his deep slide into this storm. James does not offer this as an excuse but rather as a mitigating explanation for his behavior. He is deeply sorry for his behavior and as the character letters will attest, he is very remorseful and in full acceptance of responsibility for his behavior.

2.   **Defendant's Behavior** – Between 2009 through 2017, James began and continued to run what is commonly called a "Ponzi scheme". He did it to fuel his crazy, drug-fueled lifestyle that caused him to go to Baltimore on multiple occasions to purchase cocaine and to use that cocaine with various women at strip clubs in excessive amounts. The cocaine no-doubt produced an excessive amount of grandiosity which continued to fuel this behavior, but also compelled him to need more money to continue this behavior.

James' Ponzi scheme is not similar to an individual who engages in a Ponzi scheme simply because of greed. This scheme was devised and continued because of this confluence of mental health issues and severe cocaine addiction on top of a long disease filled life of alcoholism. As most addicts do, they steal from the people they know, family, relatives, friends, people they may be involved in business with or have some type of relationship with where they would trust him in order to provide money based upon what were, in this case, false representations. This is not a case where the Defendant obtained the money and went out and bought expensive homes, yachts, airplanes, high end clothes or anything like that. Most of this money went up his nose or went down his throat in the form of cocaine mixed with heavy doses of alcohol and as he freely admitted to the probation officer, he became, "a sex addict". *See* PSR Paragraph 54, pg. 17.

In essence, he has nothing to show for the money that he has taken other than what little financial worth he has. In fact, the PSR recommends that no fine be imposed because of the insolvency of the Defendant. There are no assets for the Government to seize as is the case with many white-collar, Ponzi scheme operators. The truth is that most addicts don't save money, but rather spend every penny that they get their hands on.

James' behavior is inexcusable. The letters written by the victims of his behavior are sincere and, counsel freely admits, very compelling. They seek severe

punishment without real insight into what fueled his behavior. Of course, the obvious answer is greed, but the explanations lie so much deeper. On this point, the Court should strongly consider the letters of support written by the individuals that have insight into James' behavior. It is also significant for the Court to know that James sponsors other individuals into N.A. and A.A. programs. He opens many of the meetings and also provides emotional support to individuals that are contemplating suicide, relapse, and self-destruction in their professional and personal lives. This post-offense behavior is a strong indicator into James' rehabilitation potential. These are significant §3553(a) factors.

In **Pepper vs. U.S.**, 131 Sup. Ct. 1229 (2011), the court held that post-sentencing rehabilitative behavior can be considered by the sentencing court on remand in determining whether a downward variance is appropriate.  Further, the court held that post-offense rehabilitative behavior is a relevant mitigating factor that the court can and should consider as part of the overall sentencing calculus per 18 U.S.C. §3553(a) and 18 U.S.C. §3661.  The court found that post-sentence rehabilitative behavior on the part of the defendant should be considered by the sentencing court on remand particularly when it shows a change of heart and a willingness to change behavior.  Post **Booker**, **supra**, defendants have been allowed to request variances "from the Advisory Guideline range."  Therefore, it follows, if post-sentencing rehabilitative behavior can be considered as a

mitigating factor; surely the Court should consider *post-offense behavior as a mitigating factor.*  In **Pepper**, **supra**, the court stated, "the plain language of §3661 makes clear that there is no limitation . . . on . . . background, character, and conduct information that can be considered by the district court at time of sentencing et at 1242."  Further, his extensive involvement in N.A. and A.A. groups as well as outpatient counseling sheds light on the likelihood that he will not engage in future criminal conduct, a key factor that the Sentencing Court must consider, *See* **Pepper, supra** at 1243, and §3553(a)(2)(B)(C).

In **Pepper**, **supra**, the court stated, "most fundamentally evidence of Pepper's conduct since his release from custody in June 2005 provides the most up-to-date picture of **Pepper's** history and characteristics," §3553(a)(1), id at 1242. The court went on to state that "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing" id at 1242.

Applying **Pepper** to the Defendant's case it is clear that his post-offense rehabilitative efforts are strong evidence of his willingness to rehabilitate his behavior and become a contributing member to society. The Pre-Sentence Report focuses on the conduct that led to the offenses in question.  This Court must take a broader approach than simply the offense conduct but sentence the Defendant as he stands before the Court today.  This Court should and must consider the

Defendant's post-offense rehabilitative efforts to reform his life, battle his mental health issues, and beat the diseases of drug and alcohol addiction.

      3.    **Defendant's Cooperation with Law Enforcement Authorities –** In addition to the post-offense rehabilitative behaviors as set forth herein, the Defendant, through counsel, reached out to the case agent, FBI Special Agent Stephen Collins, to submit to an interview regarding his behavior as well as additional information that he may have concerning criminal activity particularly in the drug area. On July 16, 2018, the Defendant along with counsel, engaged in a conference call with FBI Agents Stephen Collins and Michelle O'Conner stationed at the FBI resident office in State College, Pennsylvania. During that debriefing and proffer session, the Defendant provided information concerning his behavior as well as his sources of cocaine in the Baltimore, Maryland area. In describing that behavior James, freely and without any promises or representations, incriminated himself in numerous cocaine transactions, identified suppliers with the best information that he had, several women who were involved in bringing cocaine from the Baltimore area to the Bellefonte, Pennsylvania area. Additionally, James provided information that he either had firsthand or believed may be occurring with other insurance agents in regards to misapplication of funds and financial activities. Although the information provided was historical in nature, the Defendant's description of his drug activities, the individuals involved including

distributors, sellers, and women who he used drugs with and/or acted as couriers to bring cocaine to him was true. The Defendant was never asked by the Agents to engage in pro-active activities such as wearing a wire, setting up a transaction, or any other activities involving third parties. Such behavior would have been inconsistent with his rehabilitative efforts to avoid contact with any individuals involved in the drug business and most importantly to avoid exposure to drugs and alcohol. James is fighting a day-by-day battle with mental illness and severe drug and alcohol addictions. In explaining his post-offense behavior to the agents, it was clear to counsel that they understood that the information that was provided was historical and not offered in a proactive sense.

Although the Government did not file a 5K1.1 Motion concerning "substantial cooperation" 18 U.S.C §3553(a) permits a district court to consider a defendant's cooperation with the government, even if those efforts do not lead to other convictions or produce a U.S.S.G. § 5K1.1 motion. **United States v. Taylor**, 586 F. Supp. 2d 1065, 2008 U.S. Dist. LEXIS 91406 (E.D., 10 Wis. 2008) (in substantially reducing the term of imprisonment court considered defendant's cooperation even though those efforts did not lead to other convictions or a U.S.S.G. § 5K1.1 motion); see also, **United States v. Roque**, 536 F. Supp. 2d 987, 2008 U.S. Dist. LEXIS 19856 (E.D. Wis. 2008), (based on cooperation, the court decided not to impose a prison term for marijuana and cocaine distribution where

defendant's sentence under the guidelines, level 29, called for 87-109 months imprisonment). See also, **United States v. Arceo,** 535 F.3d 679, 688 (7th Cir. 2008) (stating that the district court may rely on cooperation as a basis for going below the guidelines); **United States v. Fernandez,** 443 F.3d 19, 33 (2d Cir. 2006) (stating that a district may consider "non-5K" cooperation under § 3553(a)); **United States v. Wachowiak,** 496 F.3d 744 (7th Cir. 2006)(court reduced recommended 121 – 150-month sentence to 70 months).

The Defendant's debriefing is another mitigating fact in conjunction with his post-offense rehabilitative behavior that should be considered by this Court when imposing Sentencing.

Recently, this Court, as well as the public in general, has been exposed to defendants who engaged in financial fraud simply based upon greed or allegiance to a more powerful person from which an expectation of benefits clearly existed. For example, the national news has covered the cases of Michael Cohen and Paul Manafort almost on a daily basis if not multiple times per day. Both Cohen and Manafort engaged in numerous fraudulent activities because of greed. There are no allegations that Cohen was addicted to drugs or alcohol nor has there been any allegations that Manafort was addicted to drugs or alcohol. In fact, both acquired significant assets including multiple homes, expensive clothing, and lived very high lifestyles. In Cohen case, he received a three (3) year sentence based upon his

ability to cooperate against President Donald Trump. His thirty-six (36) month sentence based upon his plea to bank fraud, election fraud, and conspiracy to engage in that conduct was heavily based upon his cooperation with the Government. On the other hand, Manafort, who was convicted by a jury in the Eastern District Court of Virginia and had expressed no remorse before or during trial and in a halfhearted way did so at sentencing, received a sentence of forty-seven (47) months, well below the guideline range of nineteen (19) to twenty-four (24) years. Again, each case has to rest upon its own individual facts. Manafort entered into a cooperation agreement following his guilty plea in the U.S. District Court in D.C. and then lied about numerous material matters to the office of Special Counsel. In fact, the lies were so egregious that Special Counsel moved to revoke the Plea Agreement. That Motion was granted by the Court based upon numerous material lies made by Manafort following his agreement to cooperate. Again, Manafort's total sentence is a little under eight (8) years. That is considerably less than the advisory guideline sentencing range of one hundred and eighty-eight (188) to two hundred and thirty-five (235) months – fourteen and a half (14.5) to nineteen and a half (19.5) years in James' case.

In James' case, what is particularly startling is the fact that both Cohen and Manafort were licensed lawyers at the time when the crimes were committed. Manafort was a graduate of Georgetown University School of Law, one of the

most prestigious law schools in the country. Cohen was a law school graduate who was involved in numerous business and political activities and relished the title of Donald Trump's "fixer". Neither suffered from any addictions, either alcohol or drugs, and both came from families who had extensive wealth, power, and privilege. The difference between James' life and the lives of Cohen and Manafort is the difference between night and day.

Again, the Advisory Guideline Sentencing Range simply is the starting point. It is for this Court to consider all of the relevant factors in fashioning an appropriate sentence including the sentences imposed upon those motivated solely by greed as opposed to those motivated by severe addiction and mental illness.

4. **Defendant's Criminal History Overstates the Seriousness of his Prior Offenses** – Although the PSR's Criminal History Computation correctly determines the Defendant's Criminal History Category is Category V (Zone D, *See* PSR paragraph 42 page 15) with a subtotal criminal history score is nine**,** *See* PSR paragraph 40 page 15, the prior convictions overstate the seriousness of the offenses. The PSR at paragraphs 35-43 pages 13-15 correctly set forth James' criminal history, the offenses are consistent with a long history of alcohol addiction and later drug addiction. This is not a criminal history where the Defendant has been convicted of violent offenses such as robbery, burglary, assault, etc. The Defendant has four (4) prior DUI convictions in Pennsylvania and a DUI

conviction in Baltimore, Maryland. In addition, he has been convicted of Disorderly Conduct. All of the offenses are consistent with long term alcohol addiction.

Therefore, the Court should consider the nature of the offenses of convictions as it relates to the long-term diseases of alcoholism and drug addiction as well as mental health issues. The prior offenses are supportive of a downward variance for the reasons set forth herein.

5. **Defendant's Character Support Letters –**Attached to this Sentencing Memorandum are character reference letters written by the following individuals:

| Exh. No. | Name | Relationship |
|:---:|:---:|:---:|
| 1 | Stanley Stewart | Friend |
| 2 | David Risbon | Friend |
| 3 | Frederick Sims | Friend |
| 4 | Randy Troska | Friend |
| 5 | Patricia Ross | Family Friend |

The character support letters are extremely important for the Court's consideration. In particular, the letter written by David Risbon, a former drug

counselor and a supervisor of alcohol and drug treatment program at the State

Correctional Institution (SCI) at Smithfield for the last seventeen (17) years of his

career. Mr. Risbon's letter attests to the sincerity of the Defendant's commitment

to beat the disease of addiction and more importantly focuses on his own life long

struggle with addiction and his post-addiction behavior which resulted in obtaining

an associate degree from Penn State and working twenty-nine (29) years in the

drug and alcohol rehabilitation field.

Equally impressive is the letter written by Stanley Stewart of Mount Union,

Pennsylvania. Mr. Stewart outlines his own addictive past and his

accomplishments after beating his alcohol and drug addiction. It is one of the most

compelling character letters that counsel has been exposed to in his career. The

openness of Mr. Stewart's letter including his comments of his own behavior that

resulted in multiple felonies and misdemeanor charges and his post behavior

accomplishments of obtaining a bachelors Science degree from Penn State at the

age of fifty-two (52) speaks legions about the author. Mr. Stewart also, along with

Mr. Risbon, speak candidly and openly to the Court about James' post-offense

rehabilitative commitment and the progress that he is making.

Mr. Sims of Lewistown, Pennsylvania echoes those sentiments as expressed

by Mr. Risbon and Mr. Stewart. Mr. Randy Troska is also another alcoholic who

met James in 2013 through the Center County Pennsylvania DUI Court Program.

Also included is a letter authored by Patricia Ross of Mount Union, Pennsylvania, who is a friend of James' mother and expresses to the Court her impression of James as well as the good deeds and help he has provided to her around her house due to her inability to maintain her residence.

6.    **Sentencing Hearing Witnesses** – Counsel intends to call the Defendant's son, Jesse Hocker, a retired United States Marine who is now employed as a civilian contractor programing and designing drones for strategic and military purposes. Jesse lives in Hawaii with his wife. Several other witnesses will be called that support James' rehabilitative effort and his potential to make a complete recovery.

7.    **Defendant's Sentencing Request** – The Defendant, respectfully requests that the Court consider the following sentencing request.

First, that the Court impose a sentence that varies substantially downward from the Advisory Sentencing Guideline in light of the 18 U.S.C §3553(a) mitigating factors set forth herein;

Second, that the Court find that the Defendant be permitted to participate in any drug treatment plan available to him while incarcerated, including the Bureau of Prison's 500-Hour Intensive Drug Treatment Program (Intensive Residential Drug Abuse Program – RDAP);

Third, that the Court recommend to the Bureau of Prisons (BOP) that the Defendant be incarcerated as reasonably close to his residence as possible. Specifically, that the Court recommend placement at the Federal Correctional Institution (FCI) in McKean, Pennsylvania or to a FCI not greater than three hundred (300) miles from his home residence so that the Defendant may receive occasional in-person visits from family members;

Fourth, that the Defendant be allowed to report in after receiving notice of the designated FCI that he is to report to at the requisite date and time. The Defendant has always appeared when required to do so by order of Court. Further, the Defendant was released on a Personal Recognizance Bond in the amount of fifty thousand ($50,000.00) dollars. The Defendant has never violated the terms and conditions of bond as set forth in this Court's October 11, 2018 setting forth the Conditions of Release on Bond.

Respectfully Submitted,

**AMBROSE LAW FIRM**

By: */s/ Leonard G. Ambrose*
       Leonard G. Ambrose, III, Esquire
       Pa. Atty. I.D. #18824
       3702 Volkman Rd.
       Erie, PA 16506
       Ph: (814)459-5900
       Fax: (814)459-0968

*Attorneys for the Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNYSYLVANIA – ERIE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No. 4:18-CR-00313 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES E. HOCKER | : | FILED ELECTRONICALLY |

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2019, I electronically filed the foregoing Sentencing Memorandum on behalf of the Defendant, James E. Hocker, and electronically served on the parties of record using the CM/ECF system.


Assistant U.S. Attorney
Alisan V. Martin
Email: Alisan.VanFleet@usdoj.gov

Senior U.S. Probation Officer
John K. Vought
240 West Third Street
Suite 114
Williamsport, PA 17701-6458
*Service by First-class mail*


**AMBROSE LAW FIRM**


By:*/s/ Leonard G. Ambrose, III*
Leonard G. Ambrose, III
Pa. Atty. I.D. #18824
3702 Volkman Rd.
Erie, PA 16506
Ph: (814)459-5900
Fax: (814)459-0968

*Attorneys for the Defendant*