# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:18-CR-00313 |
| v. | (Chief Judge Brann) |
| JAMES E. HOCKER, | |
| Defendant. | |

## MEMORANDUM OPINION

### MARCH 1, 2024

## I.    BACKGROUND

In 2018, a criminal information was filed charging James E. Hocker with securities fraud, in violation of 18 U.S.C. § 1348.[1] Hocker then pled guilty, pursuant to a written plea agreement, to that offense.[2] The plea agreement stated that the offense carried a maximum term of 25 years' imprisonment.[3]

The plea agreement further noted that legal and factual issues surrounding the calculation of the Sentencing Guidelines would be determined by the Court.[4] The plea agreement iterated that this Court was not bound by the terms of the plea agreement and was free to impose any sentence up to the statutory maximum

---

[1]    Doc. 1. Hocker subsequently waived his right to indictment by a grand jury. Doc. 8.
[2]    Docs. 2, 9.
[3]    Doc. 2 at 1-2.
[4]    *Id.* at 7-8.

sentence.[5] It also informed Hocker that, if he received a sentence with which he was dissatisfied, he would not be permitted to withdraw his guilty plea.[6]

At the change of plea hearing, this Court reiterated that the maximum sentence that could be imposed was 25 years' imprisonment.[7] Hocker's attorney estimated that the Sentencing Guidelines range would be 72 to 87 months' imprisonment, while the Government estimated the range to be 78 to 97 months' imprisonment.[8] Hocker understood, however, that if the actual Sentencing Guidelines range were different than those estimates, he would not be able to withdraw his guilty plea.[9] He further understood that any recommendations made by the parties were not binding on the Court, and that the Court had the authority to impose a sentence outside of the Sentencing Guidelines range.[10] Hocker confirmed that he understood no one could guarantee what sentence he would receive, and this Court could impose a sentence that was more severe than Hocker expected, without permitting him to withdraw his guilty plea.[11]

The Court ultimately accepted the guilty plea, and a Presentence Report (PSR) was prepared.[12] The PSR described the underlying crime in some detail, noting that

---

[5]   *Id.* at 20-21.
[6]   *Id.* at 21.
[7]   Doc. 14 at 9.
[8]   *Id.* at 10-11.
[9]   *Id.* at 11.
[10]   *Id.* at 12.
[11]   *Id.* at 13, 17.
[12]   Docs. 10, 16.

Hocker was a licensed insurance agent who began his own business in 2007 selling insurance products and annuities.[13] Then, from approximately 2009 until January 2018, Hocker began defrauding individuals—both clients and non-clients—by promising to invest funds in Standard and Poor's 500 Index and other investment vehicles.[14] Hocker promised his victims returns on their investments of 25 to 30 percent but never invested the funds they provided to him.[15]

Hocker often initiated a relationship with his victims—many of whom were elderly and had limited investment experience—by selling them annuities or life insurance policies.[16] He also encouraged his existing clients to liquidate their investments and give those funds to him to invest, despite the fact that the clients would often pay significant fees and penalties for liquidating those investments.[17] The PSR provided specific details on Hocker's numerous victims—including his own family members—and the amount of money they gave to him.[18]

The PSR detailed how Hocker had promised to invest those funds but, instead, placed them into bank accounts that he controlled.[19] He also did not reimburse clients for fees, penalties, and taxes associated with their withdrawal of money from

---

[13]  Doc. 16 at 3
[14]  *Id.*
[15]  *Id.* at 4.
[16]  *Id.* at 3-4.
[17]  *Id.*
[18]  *Id.* at 4-9.
[19]  *Id.* at 9.

insurance policies or IRA accounts, as he had promised.[20] Hocker would sometimes provide statements purporting to show that the individuals' account balances were growing, and sometimes returned funds to investors; Hocker claimed these were returns on investment when, in fact, the funds simply came from other victims.[21] Rather than invest the funds entrusted to him, Hocker generally used the funds on personal expenses.[22]

The PSR noted that 42 victims of the fraud scheme had been identified, of which 34 responded to inquiries from the Probation Office.[23] These 34 victims generally reported significant losses, and all but four reported suffering financial hardship due to their fraud-induced losses.[24] The PSR calculated total losses from the scheme at $1,495,782.62, with victims specifically identifying losses of $1,341,744.30.[25]

The PSR calculated a base offense level of 7[26] but increased the offense level by 14 levels because the scheme caused losses of between $550,000 and $1,500,000,[27] by 6 levels because the scheme caused substantial financial hardship for 25 or more victims,[28] by 4 levels because the offense involved a violation of

---

[20]   *Id.*
[21]   *Id.* at 9-10.
[22]   *Id.* at 10.
[23]   *Id.*
[24]   *Id.* at 10-11.
[25]   *Id.*
[26]   *Id.* at 12; *U.S. Sentencing Guidelines Manual* § 2B1.1(a)(1) (2018).
[27]   Doc. 16 at 12; USSG § 2B1.1(b)(1)(H).
[28]   Doc. 16 at 12; USSG § 2B1.1(b)(2)(C).

securities law while Hocker was an investment advisor,[29] by 2 levels because Hocker knew or should have known that one or more of his victims was a vulnerable victim,[30] and by 2 levels because Hocker had abused a position of trust or used special skill to facilitate the commission or concealment of the offense.[31] The PSR subtracted 3 levels for acceptance of responsibility, resulting in a total offense level of 32.[32]

The PSR further detailed Hocker's criminal history, which was significant for multiple convictions for driving while under the influence.[33] Those offenses garnered nine criminal history points which, when combined with two points for committing this offense while on supervision for prior offenses,[34] resulted in eleven criminal history points and a criminal history category V.[35] With an offense level of 32 and a criminal history category V, the PSR calculated an advisory sentencing range of 188 to 235 months' imprisonment.[36]

---

[29]  Doc. 16 at 12; USSG § 2B1.1(b)(20)(A)(iii).
[30]  Doc. 16 at 12; USSG § 3A1.1(b)(1).
[31]  Doc. 16 at 12; USSG § 3B1.3.
[32]  Doc. 16 at 12; USSG § 3E1.1(a), (b).
[33]  Doc. 16 at 13-14.
[34]  USSG § 4A1.1(d). The Court notes that the United States Sentencing Commission has since passed Amendment 821, which applies retroactively and modifies the provision that added two points for committing the offense while under supervision. However, the current Guidelines still add one point if a defendant commits an offense while under supervision, if he has seven or more criminal history points, which Hocker did. *See U.S. Sentencing Guidelines Manual* § 4A1.1(e) (2023). Accordingly, even under the new Sentencing Guidelines, Hocker would still have ten criminal history points and would remain a criminal history category V.
[35]  Doc. 16 at 13-15.
[36]  *Id.* at 20.

Prior to sentencing, Hocker's attorney ("Counsel") submitted a sentencing memorandum to the Court.[37] In that memorandum, Counsel advocated for a downward variance for several reasons.[38] Counsel noted Hocker's difficult upbringing, the circumstances of his family, as well as his history of drug and alcohol abuse, mental health issues, post-arrest rehabilitative efforts, and cooperation with law enforcement.[39] And most significantly as it relates to Hocker's current motion, Counsel argued that Hocker's criminal history significantly overstated the seriousness of his prior offenses, since those offenses involved convictions for driving while under the influence of alcohol which, Counsel argued, were caused by Hocker's alcohol addiction.[40]

At sentencing, Counsel reiterated his argument that Hocker's criminal history category substantially overrepresented his criminal history, as all of his prior scored offenses were for driving under the influence of alcohol, which occurred as a direct result of his alcohol addiction.[41] However, the Court rejected Hocker's arguments in favor of a downward variance and imposed a within-Guidelines sentence of 204 months' imprisonment, based primarily on the severity of Hocker's offense.[42]

---

[37]   Doc. 20.
[38]   *Id.*
[39]   *Id.* at 4-15.
[40]   *Id.* at 17-18.
[41]   Doc. 35 at 17-18.
[42]   *Id.* at 65-76.

Hocker thereafter filed an appeal with the United States Court of Appeals for the Third Circuit; that court dismissed Hocker's appeal after finding that it was barred by the appellate waiver contained in Hocker's plea agreement.[43] Hocker did not petition the Supreme Court of the United States for certiorari.[44]

In December 2022, Hocker filed this timely 28 U.S.C. § 2255 motion challenging his conviction and sentence based upon allegations of ineffective assistance of counsel.[45] Hocker raises a single claim of ineffective assistance of counsel, with three distinct subclaims.[46] First, Hocker argues that Counsel was ineffective in estimating a criminal history category I, rather and V, which resulted in a significantly higher Sentencing Guidelines range than Hocker anticipated.[47] Second, Hocker contends that Counsel was ineffective for failing to move for a downward departure, pursuant to USSG § 4A1.3(b), on the ground that Hocker's criminal history category substantially overrepresented the seriousness of his criminal past, given that all of Hocker's scored convictions were for drunk driving.[48] Finally, Hocker asserts that Counsel was ineffective for failing to object to offense level increases for the number of victims and because the offense involved vulnerable victims.[49]

---

[43] Doc. 55.
[44] Doc. 60 at 2.
[45] Doc. 60.
[46] Doc. 72.
[47] *Id.* at 18-20.
[48] *Id.* at 20-21.
[49] *Id.* at 9, 20.

The Government responds that Hocker did not receive ineffective assistance of counsel.[50] It first argues that Counsel's erroneous Sentencing Guidelines estimate cannot form the basis of an ineffective assistance of counsel claim because this Court conducted an appropriate colloquy that informed Hocker of his possible sentencing exposure.[51] Second, the Government contends that Counsel was not ineffective in failing to move for a downward departure because he sought a downward variance on the same ground, and this Court rejected that argument.[52] Finally, the Government argues that Hocker has failed to provide any evidence to support his assertion that Counsel was ineffective in failing to lodge objections to the PSR, and has failed to articulate why Counsel's decision to not object was not a strategic choice entitled to deference.[53]

Hocker has not filed a reply brief, and the time to so do has now lapsed. Accordingly, this matter is ripe for disposition and, for the following reasons, the Court will deny Hocker's motion.

---

[50]  Doc. 75.
[51]  *Id.* at 7-11.
[52]  *Id.* at 11-13.
[53]  *Id.* at 13-16.

## II.    DISCUSSION

### A.    Ineffective Assistance of Counsel

"In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims."[54] "The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"[55] In determining whether an attorney's performance is deficient, courts must "determine whether, in light of all the circumstances, the [attorney's] acts or omissions were outside the wide range of professionally competent assistance."[56] As the United States Supreme Court has emphasized:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[57]

"The second part [of the *Strickland* test] specifies that the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"[58]

---

[54] *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015).
[55] *Id.* (quoting *Strickland*, 466 U.S. at 687).
[56] *Strickland*, 466 U.S. at 690.
[57] *Id.*
[58] *Bui*, 795 F.3d at 366 (quoting *Strickland*, 466 U.S. at 694).

"This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable."[59] "In the context of a guilty plea, the prejudice prong of the test requires a showing 'that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'"[60]

As to Hocker's first argument—Counsel was ineffective in providing an erroneous sentencing estimate—the record is clear that Counsel erroneously estimated a Sentencing Guidelines range of 72 to 87 months' imprisonment, while the actual Sentencing Guidelines range was 188 to 235 months' imprisonment—a significant difference. However, based on clear precedent from the Third Circuit, this claim fails.

The Third Circuit has long held that "[w]hen addressing a guilty plea, counsel is required to give a defendant enough information to make a reasonably informed decision whether to accept a plea offer," which necessarily includes "the comparative sentence exposure between standing trial and accepting a plea offer."[61]

---

[59] *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks omitted).

[60] *United States v. Fazio*, 795 F.3d 421, 426 (3d Cir. 2015) (quoting *Hill v. Lockhart,* 474 U.S. 52, 59 (1985)).

[61] *Bui*, 795 F.3d at 367.

"However, an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where an adequate plea hearing was conducted."[62]

The Third Circuit has emphasized that:

> all that the law requires is that the defendant be informed of his/her exposure in pleading guilty. The law does not require that a defendant be given a reasonably accurate "best guess" as to what his/her actual sentence will be; nor could it, given the vagaries and variables of each defendant's circumstances and offending behavior.[63]

Accordingly, where a court's plea colloquy accurately establishes the maximum term of imprisonment that the defendant faces and advises the defendant that the court has the discretion to impose a sentence outside of the Sentencing Guidelines range and up to the statutory maximum term of imprisonment, a defendant suffers no prejudice from an erroneous sentencing prediction by his attorney.[64]

Here, both the plea agreement and the Court's plea colloquy informed Hocker of these critical facts. Hocker was informed that the charged offense carried a statutory maximum sentence of 25 years' imprisonment,[65] and that the Court was not bound by the Sentencing Guidelines range but was instead "free to impose upon the defendant any sentence up to and including the maximum sentence of

---

[62] *Id.* (brackets and internal quotation marks omitted)).
[63] *United States v. Shedrick,* 493 F.3d 292, 299 (3d Cir. 2007).
[64] *Id.* at 299-300.
[65] Doc. 2 at 1-2; Doc. 14 at 9.

imprisonment for 25 years."[66] Because the plea agreement and the plea colloquy that the Court conducted with Hocker cured any potential prejudice from Counsel's erroneous sentencing estimate, this claim of ineffective assistance of counsel fails.

Turning to Hocker's argument that Counsel was ineffective in failing to move for a downward departure on the ground that Hocker's criminal history category substantially overrepresented his criminal history, the Court finds neither deficient performance nor prejudice. Counsel raised the issue of Hocker's criminal history category and argued that a downward variance was appropriate because Hocker's criminal history was driven by his alcoholism and several convictions for driving while under the influence of alcohol.[67] This is the precise argument that Hocker asserts Counsel should have raised. That Counsel did so in a request for a variance rather than a departure is of no moment, as the requests are functionally the same.[68]

Even if Counsel's performance could be considered deficient, Hocker suffered no resulting prejudice. This Court rejected the argument that Hocker should receive a variant sentence based upon the fact that his prior convictions were alcohol related.[69] If Counsel had made the same arguments in relation to a motion for a

---

[66]  Doc. 2 at 20; *see* Doc. 14 at 11-12.
[67]  Doc. 20 at 17-18; Doc. 35 at 17-18.
[68]  *See Brown v. United States*, No. 17-14215-C, 2018 WL 1474898, at *2 (11th Cir. Feb. 21, 2018) (finding no deficient performance when attorney sought variance rather than downward departure because "counsel cannot be adjudged incompetent for performing in a particular way if the approach taken might be considered sound strategy").
[69]  Doc. 35 at 65-76.

departure rather than a variance, the same outcome would have resulted and, therefore, Hocker cannot demonstrate that his sentence would have changed.[70]

Finally, there is no merit to the argument that Counsel was ineffective for failing to object to the application of USSG § 3A1.1(b)(1) because the offense involved a vulnerable victim, or USSG § 2B1.1(b)(2)(C) due to the number of victims involved.[71]

As to the vulnerable victim adjustment, a two level increase applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim,"[72] which the commentary to the Guidelines in turn defines as a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."[73] Hocker challenges the existence of any vulnerable victims because, while some victims were elderly at the time of sentencing, he argues that they were not elderly "years before" when he began defrauding them.[74]

---

[70] *See Brown*, 2018 WL 1474898 at *2 (finding no prejudice in decision to seek a variance rather than a departure because the "district court undoubtedly would have denied a request for a departure").

[71] Hocker in his brief states that his offense level was increased "under USSG § 3A1.1(b)(2)," Doc. 72 at 3, which does provide for a two-level increase for a large number of victims, but only for hate crimes. *See* USSG § 3A1.1(b)(2). Hocker's offense level was increased pursuant to § 2B1.1(b)(2)(C), Doc. 16 at 12, which provides for a six-level increase if an offense resulted in substantial financial hardship to 25 or more victims. USSG § 2B1.1(b)(2)(C).

[72] USSG § 3A1.1(b)(1).

[73] *Id.* cmt. n. 2.

[74] Doc. 72 at 3.

However, as this Court observed at sentencing, most of Hocker's victims were elderly retirees, including one woman who was 86 years old.[75] Given that Hocker's crime ended just over one year prior to sentencing, his arguments hold no water.[76] Moreover, Hocker's victims were vulnerable in more ways than simply their age. For example, Hocker had promised Lola Thompson's dying husband that he would take care of Lola; in 2016 Hocker attended Thompson's husband's funeral and told Thompson that it would "be okay."[77] Hocker then took $80,000 from Thompson as part of the fraud scheme.[78] Under those circumstances, Thompson would certainly be considered a vulnerable victim.[79] Because it is clear that there were vulnerable victims in this case and any objection would have been without merit, Counsel did not perform deficiently in failing to lodge a meritless objection, nor was Hocker prejudiced by that failure.

As to the six-level increase because the offense caused substantial financial hardship to 25 or more victims, Hocker argues only that the number of victims "was artificially inflated by including persons who were my clients but whose accounts were not affected by the fraud."[80] However, the PSR clearly identified victims and

---

[75] Doc. 35 at 68-69.
[76] Doc. 16 at 3.
[77] Doc. 87 at 12.
[78] *Id.*
[79] *Cf. United States v. Alexander*, 71 F. App'x 106, 110 (3d Cir. 2003) (finding that individual was a vulnerable victim based on age and "strong emotional interest in [the defendant's] well being").
[80] Doc. 72 at 3.

the loss amounts that they suffered, and reflected that 30 victims reported suffering substantial financial hardship as a result of the fraud.[81] Absent any evidence from Hocker that these numbers were somehow exaggerated, the Court cannot conclude that Counsel was deficient in failing to object to the application of USSG § 2B1.1(b)(2)(C), or that Hocker was prejudiced by that failure. Consequently, the record establishes no ineffective assistance of counsel, and Hocker's § 2255 motion will be denied.

### B.     Certificate of Appealability

Because this Court will deny Hocker's § 2255 motion, this decision will not be appealable unless this Court or a circuit justice issues a certificate of appealability.[82] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[83] To satisfy this standard Hocker must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional claim is debatable or wrong.[84] This Court finds that Hocker has not met this burden, and therefore declines to issue a certificate of appealability.

---

[81]   Doc. 16 at 10-11.

[82]   28 U.S.C. § 2253(c)(1)(B).

[83]   *Id.* § 2253(c)(2).

[84]   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

III.   **CONCLUSION**

For the foregoing reasons, the Court concludes that Hocker did not receive ineffective assistance of counsel, and his 28 U.S.C. § 2255 motion will be denied. The Court will also deny a certificate of appealability.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge